IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| PATRICK AND JEANNE STILLMOCK, et al. | * * * * | |
| Plaintiffs, | * | CIVIL ACTION NO. MJG-07-1342 |
| v. | * * | (Consolidated with MJG-07-1466 and MJG-08-3430) |
| WEIS MARKETS, INC., | * * | |
| Defendant. | | |

**MEMORANDUM OF WEIS MARKETS, INC.,**
**IN OPPOSITION TO CLASS CERTIFICATION**

Gerard J. Gaeng (Bar No. 04970)
Rosenberg | Martin | Greenberg, LLP
25 S. Charles St., Suite 2115
Baltimore, MD 21201
Phone: (410) 727-6600
Fax: (410) 727-1115

and

OF COUNSEL
Dana B. Klinges
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103-4196
Phone: (215) 979-1143
Fax: (215) 405-2632

and

Charles M. Hart
DUANE MORRIS LLP
1940 Route 70 East, Suite 200
Cherry Hill, NJ  08003
Telephone: 856.874.4200
Fax: 215-405-2548

Attorneys for Weis Markets, Inc.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II. PROCEDURAL POSTURE .................................................................................2

III. ARGUMENT .........................................................................................................4

    A.    Background of Rule 23(b)(3) and the Superiority Requirement ........................... 4

    B.    Plaintiffs' Proposed Class Action Fails the Manageability Test. .......................... 6

        1.    Class treatment would present intractable management problems because plaintiffs rely on the "opt-out" provision to identify class members. ...........................................................................................................7

        2.    Plaintiffs have failed to demonstrate that they can identify and locate member of the putative class. .........................................................9

        3.    Plaintiffs' assertion that notice can be given to a substantial portion of the purported class is based only on speculation. .................................12

    C.    Superiority Is Lacking When Class Treatment Risks  Highly Undesirable Results .................................................................................................................. 14

        1.    Consideration of the practical effects of a potential damages award in this case requires denial of class certification.........................................14

        2.    Rule 23(b)(3)'s superiority requirement is not satisfied where potential damages would annihilate Weis Markets and the harm to the putative class is non-existent..............................................................17

        3.    It is entirely appropriate, indeed essential, to consider potential damages at the class certification stage. ....................................................20

        4.    Class Treatment Is Not Superior to alternative methods of resolving the issues raised by plaintiffs. .....................................................23

    D.    The possibility of attorney abuse of the system strongly militates against class certification. ............................................................................................... 26

    E.    The named plaintiffs cannot represent the multiple sub-classes that the Fourth Circuit found necessary to resolve the issue of disparate damages........... 30

IV. CONCLUSION.....................................................................................................33

# TABLE OF AUTHORITIES

## CASES

*Alsup v. Montgomery Ward & Co.*,
57 F.R.D. 89 (N.D. Cal. 1972).........................................................................21

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..................................................................................5, 25

*Anderson v. Capital One Bank*,
224 F.R.D. 444 (W.D. Wis. 2004).....................................................................24

*Barber v. Kimbrell's*,
577 F.2d 216 (4th Cir. 1978) ....................................................................20, 22

*Buford v. Am. Fin. Co.*,
333 F. Supp. 1243 (N.D. Ga. 1971)....................................................................27

*Campos v. Choicepoint, Inc.*,
237 F.R.D. 478 (N.D. Ga. 2005)........................................................................24

*Chakejian v. Equifax Information Services, LLC*,
256 F.R.D. 492 (E.D.Pa. 2009)........................................................................24

*Clark v. Cameron-Brown Co.*,
72 F.R.D. 48 (M.D.N.C. 1976) ..........................................................................5

*Cotchett v. Avis Rent-A-Car System, Inc.*,
56 F.R.D. 549 (S.D.N.Y.1972) .........................................................................30

*Crawford v. Equifax Payment Servs., Inc.*,
201 F.3d 877 (7th Cir. 2000) ............................................................................7

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974)........................................................................................7

*Free World Foreign Cars, Inc. v. Alfa Romeo*,
55 F.R.D. 26 (S.D.N.Y.1972) ..........................................................................30

*Gaffney v. United States*,
834 F. Supp. 1 (D.D.C. 1993) ..........................................................................7

*Gariety v. Grant Thornton, LLP*,
368 F.3d 356 (4th Cir. 2004) ...........................................................................6

*Georgine v. Amchem Prods., Inc.*,
    83 F.3d 610 (3d Cir. 1996), *aff'd sub nom.*, 521 U.S. 591 (1997)............................5

*In Re Hotel Telephone Charges*,
    500 F.2d 86 (9th Cir. 1974). ...........................................................14, 30

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008)..................................................................28

*Legge v. Nextel Communications, Inc.*, No. CV 02-8676 DSF (VNKx),
    2004 WL 5235587 (C.D. Cal. June 25, 2004) .........................................23

*Leysoto v. Mama Mia I., Inc.*,
    255 F.R.D. 693 (S.D. Fla. 2009) ......................................................16, 22

*London v. Wal-Mart Stores, Inc.*,
    340 F.3d 1246 (11th Cir. 2003) ............................................................21

*Lopez v. KB Toys Retail, Inc.*, No. CV 07-144-JFW,
    2007 U.S. Dist. LEXIS 82025 (C.D. Cal. July 17, 2007) ..........................27

*Mace v. Van Ru Credit Corp.*,
    109 F.3d 338 (7th Cir. 1997) ...............................................................25

*Maguire v. Sandy Mac, Inc.*,
    145 F.R.D. 50 (D.N.J. 1992) ...............................................................24

*Mathews v. Book-of-the-Month-Club, Inc.*,
    62 F.R.D. 479 (N.D. Cal. 1974).............................................................24

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 US 71 (2006)................................................................................28

*Murray v. GMAC Mortg. Corp.*,
    434 F.3d 948 (7th Cir. 2006) ..........................................................18, 21

*Najarian v. Avis Rent a Car Sys.*, No. CV 07-588-RGK (Ex),
    2007 U.S. Dist. LEXIS 59932 (C.D. Cal. June 13, 2007) .........................24

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001)..................................................................28

*In re Nissan Motor Corp. Antitrust Litig.*,
    552 F.2d 1088 (5th Cir. 1977) .........................................................10, 14

*Oppenheimer Fund, Inc. v. Sanders*,
    437 U.S. 340 (1978)............................................................................9

*Philip Morris, Inc. v. Angeletti*,
   358 Md. 689 (2000) ....................................................................................28

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985)................................................................................. 7-8

*Price v. Lucky Strike Entertainment, Inc.,* No. CV 07-0960,
   2007 WL 4812281 (C.D. Cal. Aug. 31, 2007)...................................24, 27

*Ratner v. Chemical Bank New York Trust Company*,
   54 F.R.D. 412 (S.D.N.Y. 1972) ..........................................20, 21, 22, 23

*In re Rhone-Poulenc Rorer, Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ....................................................................28

*Sanchez v. Wal Mart Stores, Inc.*, No. Civ. 2:06-CV-02573-JAM-KAM,
   2009 U.S. Dist. LEXIS 48428 (E.D. Cal. May 28, 2009)........................30

*Serna v. Big A Drug Stores, Inc.*, No. SACV 07-0276,
   2007 U.S. Dist. LEXIS 82023 (C.D. Cal. Oct. 9, 2007)..........................25

*Shroder v. Suburban Coastal Corp.*,
   729 F.2d 1371 (11th Cir. 1984) ................................................................21

*Simon v. Ashworth, Inc.*, No. CV071324GHKAJWX,
   2007 WL 4811932 (C.D. Cal. Sept. 28, 2007) .........................................27

*Stillmock v. Weis Markets, Inc.*, No. MJG-07-1342,
   2009 WL 595642 (D. Md. March 5, 2009)............................2, 8, 15, 18

*Stillmock v. Weis Markets, Inc.*, No. 09-1632,
   2010 WL 2621041 (4th Cir. Jul. 1, 2010)...................................... Passim

*In re: Toys "R" Us – Del., Inc. – FACTA Litig.*, MDL 08-01980 MMM, slip op.
   (C.D. Cal. August 17, 2010) ............................................................... 22-23

*Watkins v. Simmons & Clark, Inc.*,
   618 F.2d 398 (6th Cir. 1980) ....................................................................21

*Wilcox v. Commerce Bank*,
   474 F.2d 336 (10th Cir. 1973) ..................................................................21

*Windham v. American Brands, Inc.*,
   565 F.2d 59 (4th Cir. 1977) ...............................................6, 14, 23, 32

## STATUTES

15 U.S.C. § 78u-4(b)(2) ................................................................................... 28-29

15 U.S.C. §§ 1601-1693r .....................................................................................20

15 U.S.C. § 1640(a)(2)(B) ...................................................................................20

15 U.S.C. §§ 1667-1667f .....................................................................................20

15 U.S.C. § 1679g(a)(1) .......................................................................................20

15 U.S.C. § 1681c(g) .......................................................................................1, 18

15 U.S.C. §1681c(g)(3) .......................................................................................19

15 U.S.C. § 1681n(a) .............................................................................................9

15 U.S.C. § 1681n(a)(1)(A) ...........................................................................26, 30

15 U.S.C. § 1681n(a)(2) .......................................................................................15

15 U.S.C. § 1681n(a)(3) .......................................................................................15

15 U.S.C. § 1681n(c) ............................................................................................29

15 U.S.C. § 1681o(a) .............................................................................................8

15 U.S.C. § 1681s(a) ............................................................................................25

15 U.S.C. § 1681s(a)(2)(A) ..................................................................................26

15 U.S.C. § 1681s(a)(2)(B) ..................................................................................26

15 U.S.C. § 1681s(b) ............................................................................................25

15 U.S.C. § 1691e(b) ............................................................................................20

15 U.S.C. § 1692k(a)(2)(B) ..................................................................................20

15 U.S.C. § 1693m(a)(2)(B)(ii) ...........................................................................20

28 U.S.C. § 2072(b) ...............................................................................................5

## OTHER AUTHORITIES

5 *Moore's Federal Practice,* § 23.46[2][e][i] (2010) .................................... 6-7

7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1779 (3d ed. 2005) ...........................................23

Fed. R. Civ. P. 11 ................................................................................................... 26-27

Fed. R. Civ. P. 23 ................................................................................................. Passim

Fed. R. Civ. P. 23 Advisory Committee Notes, 39 F.R.D. 69 (1966) ........................................5, 6

Marvin E. Frankel, *Amended Rule 23 from a Judge's Point of View*, 32 Antitrust L.J. 395 (1966) ...................................................................................................................23

Marvin E. Frankel, *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39 (1967) ...............................................................................................................23

U.S. Department of Labor, *Unemployment Rates by County in Pennsylvania* (Sept. 7, 2010), http://www.bls.gov/ro3/palaus.htm .............................................................16

I.    **INTRODUCTION**

Weis Markets opposes certification of the unwieldy, ill-defined nationwide class that plaintiffs seek to represent, no member of which has suffered any actual damages resulting from the alleged violation of the Fair and Accurate Credit Transactions Act ("FACTA").  P.L. 108-159, 15 U.S.C. § 1681c(g).  Weis Markets' customers who received electronically-printed receipts displaying more than the last five digits of their credit or debit card account number after the effective date of FACTA will number in the millions and may live anywhere in the United States.  Thus, the proposed class will not be easily identified or contacted by any method that plaintiffs will be able to propose.  The claims process alone will require the Court to oversee the administration of potentially millions of individual responses.  In such circumstances, a class action is not worth the trouble it would take to manage it.

Even if a class action were reasonably manageable in these circumstances, plaintiffs' request for class certification falters and fails on the "superiority" prong of Rule 23(b)(3) for the separate reason that class treatment opens the door, as the Fourth Circuit recognized, to very undesirable results.  Indeed, class treatment could easily annihilate Weis Markets without providing any benefit to a plaintiff class or redressing any actual injury.  When, as in this case, enormous potential statutory damages threaten to obliterate a long-established grocery chain and, with it, the jobs of thousands of employees who had no role in any violation of federal law, class treatment is decidedly inferior to other means of resolving the issues presented.  Rule 23 not only accommodates this serious concern, it mandates denial of class certification when certification would produce such highly undesirable results.

Finally, in reviewing whether the "predominance" requirement of Rule 23(b)(3) was met—especially given apparent differences among absent class members with respect to the number of receipts each received—the Fourth Circuit Court of Appeals held, not that those

1

differences were illusory, but that, in spite of differences between members, the proposed class could meet the predominance requirement, if it were "broken down" into sub-classes to address those differences. *Stillmock v. Weis Markets, Inc.*, No. 09-1632, 2010 WL 2621041 at *5 (4th Cir. Jul. 1, 2010). Of course, if that were done, each of the Rule 23 factors: numerosity, commonality, typicality and adequacy, as well as "predominance" and "superiority," would need to be met as to each sub-class representative. Plaintiffs have not proposed, nor can they, adequate sub-classing to satisfy the appeals court's instructions. Accordingly, certification of a nationwide class may be denied on this ground, as well.

## II.    **PROCEDURAL POSTURE**

This case consolidates three actions alleging substantially the same facts. *See* Orders, Docket Numbers 78, closing MJG-07-1466 (adding Barnstein as a plaintiff in MJG-07-1342), and 79, closing as moot case MJG-08-3430 (adding Opacic as a plaintiff in MJG-07-1342). By Memorandum Order dated March 5, 2009, this Court denied plaintiffs' initial motion for class certification under Rule 23(b)(3) on the grounds that individual questions as to harms suffered by each class member predominated over common issues and that a class action would not be superior to a "test case," considering the probable applicability of offensive issue preclusion.[1] *Stillmock v. Weis Markets, Inc.*, No. MJG-07-1342, 2009 WL 595642 at *6 (D. Md. March 5, 2009).

On June 3, 2009, the Court of Appeals for the Fourth Circuit granted plaintiffs' petition to  appeal pursuant to Federal Rule of Civil Procedure 23(f).  The circuit court later vacated the

---

[1]     Weis Markets understands that plaintiffs renew their motion to certify solely under Rule 23(b)(3) and have abandoned their previous contention that a class may be certified under subsection (b)(2) of the Rule.  This Court determined that "Rule 23(b)(2) does not provide a basis for class certification." *Stillmock*, 2009 WL 595642  at *3.  Plaintiffs did not appeal that ruling and it is now the law of the case.

denial of class certification, in part because it believed distinctions between class members based on how many receipts each received could be managed by using subclasses.  The appeals court ultimately remanded to this court with instructions to consider the alternative arguments against class certification.  *Stillmock*, No. 09-1632, 2010 WL 2621041 at *7.  As the concurrence observed, one of those arguments is whether certifying a class "in cases where no plaintiff has suffered any actual harm from identity theft and where innocent employees may suffer the catastrophic fallout could . . . have been Congress's intent."  *Id.* at *8.

The parties agreed to a briefing schedule for plaintiffs' renewed motion for class certification, which the court memorialized in a Scheduling Order (Docket # 96).  Because the agreed schedule calls for simultaneous briefing, Weis Markets assumes, as it must, that plaintiffs seek to certify the same class that they sought to represent in the original motion.  In that original motion, filed July 25, 2008, plaintiffs described the putative class as follows:

> All persons in the United States to whom, on or after the effective and applicable dates for FACTA compliance and continuing through the resolution of this case, received from Defendant at any of its retail locations, an electronically printed receipt at the point of sale or transaction which contained more than the last five digits of the person's credit or debit card number.

Plaintiffs' Memorandum In Support of Motion For Certification of the Class (hereinafter "Pl. July 25, 2008 Mem.") at 1.  Plaintiffs asked to exclude from the Class anyone who "suffered actual damages due to identity theft caused by Defendant's FACTA violations," as well as executives of Weis Markets.  *Id.* at 2.  The class plaintiffs seek to certify, therefore, can be described succinctly as all "consumer," that is non-business, customers of Weis Markets who used a debit or credit card to make a purchase between the effective date of FACTA and June 7,

2007, at which time all point of sale equipment was made FACTA compliant, excluding those who suffered actual damages and all "executives" of Weis Markets.[2]

Without question, this Court has broad discretion under Rule 23 to reconsider on remand every reason offered against class certification by Weis Markets, as well as any that the Court may deem important independently.

## III.   ARGUMENT

Even though a proposed class may appear to satisfy the general requirements of Rule 23(a), Rule 23(b) imposes additional and important limitations, some of constitutional dimensions, on the use of the class device.  Rule 23(b)(3) reposes considerable discretion in the district courts to certify class actions only when, and if, the added complexity that always accompanies class treatment is justified and the class procedure is superior to any other means of resolving the issues raised in the complaint.  In this case, class treatment has not been shown to be manageable and certification is not superior to alternatives.

### A.   Background of Rule 23(b)(3) and the Superiority Requirement

Rule 23(b)(3) first appeared in the 1966 amendments to the Federal Rules of Civil Procedure.  The Advisory Committee Notes to those amendments stress the broad discretion that the Rule affords the district courts in deciding whether to certify a damages class action, which

---

[2]     In their initial motion, plaintiffs also sought to certify a sub-class of shoppers at a single Weis Markets location (Store #186).  *Id.*  At argument on the motion, this Court observed:  "If there's going to be a subclass for this one store in Pennsylvania, there's got to be some justification for it, in which case everything you say falls apart."  Official Transcript of Motions Hearing of February 9, 2009 (hereinafter "Tr. at __") (attached as Ex. A) at 32, lines 15-18.  At argument, plaintiffs' counsel agreed.  Tr. at 33, lines 7-8.  Weis Markets therefore assumes plaintiffs have abandoned the sub-class for Store #186 alone, but will address the issue in its responsive briefing should this assumption prove incorrect.

the Committee frankly noted may *not* always be the best method in which to proceed.  The

Committee wrote:

> In the situations to which this subdivision [(b)(3)] relates, class-action treatment is *not as clearly called for* as in those described above [(b)(1) and (b)(2)], but it may nevertheless be *convenient and desirable depending upon the particular facts*.  Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or *bringing about other undesirable results*.

Advisory Committee Notes, 39 F.R.D. 69, 102-03 (1966) (emphasis added).

According to the Supreme Court, Rule 23(b)(3), when introduced, was an

"adventuresome innovation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-15

(1997)(internal quotations omitted).  It also was—as it remains today—the "most . . .

controversial provision for class actions" since "it creates the greatest hazard for judicial

miscalculations."  *Clark v. Cameron-Brown Co.*, 72 F.R.D. 48, 57 (M.D.N.C. 1976) (internal

quotations omitted).  To guard against such miscalculations, Rule 23(b)(3) requires courts "to

balance, in terms of fairness and efficiency," the benefits of a damages class action against other

methods of resolving the dispute and the likelihood, *vel non*, of "bringing about other undesirable

results."  *See Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996), *aff'd sub nom.*,

*Amchem*, 521 U.S. 591 (1997); *see also Amchem*, 521 U.S. at 615.  In balancing the advantages

and disadvantages of class treatment, it is worth recalling that Rule 23 creates no "right" in the

named plaintiffs to pursue a case on a class-wide basis, rather than as individual plaintiffs.  The

Rules Enabling Act explicitly declares that the rules of procedure "shall not abridge, enlarge or

modify any substantive right." 28 U.S.C. § 2072(b).  By the same token, none of the named

plaintiffs will be denied his or her day in court because class certification is not granted.

To further reign in the use of this "adventuresome innovation," Rule 23(b)(3) contains additional requirements that must be met before a class may be certified.  The Rule contains a list—which is by no means exhaustive—of particular factors that bear on the determinations of these "predominance" and "superiority" requirements.  *See* Fed. R. Civ. P. 23(b)(3)(A)-(D); Advisory Committee Notes, 39 F.R.D. at 104 ("Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings.").  The last of these four enumerated concerns is "manageability," in which a host of practical considerations of judicial administration and fairness to the litigants commingle.

### B.      Plaintiffs' Proposed Class Action Fails the Manageability Test.

Part of the "rigorous analysis" required under Rule 23(b)(3) is a practical assessment of "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D); *see Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 367 (4th Cir. 2004)(discussing need to conduct a "rigorous analysis," rather than accept mere "assertions" in support of class certification).  It is a "firmly established principle that the issue of manageability of a proposed class action is always a matter of 'justifiable and serious' concern for the trial court and peculiarly within its discretion." *Windham v. American Brands, Inc.*, 565 F.2d 59, 65 (4th Cir. 1977)(citation omitted).  The "manageability" requirement "encompasses the entire range of practical problems that may render a class action an inappropriate method of adjudicating a particular issue."  5 *Moore's Federal Practice,* § 23.46[2][e][i] (2010).

Hence, "[o]ne aspect of manageability is the difficulty and expense of communicating with members of the class, including any practical difficulties and expense of providing mandatory notice of certification and opt out rights to every class member."  *Id.*  "If the members of the class are not identifiable, managing the action may pose insurmountable problems."  *Id.* Because procedural obstacles such as individual notice and the opportunity to opt out are only

encountered in Rule 23(b)(3) class actions, the problems created by class treatment may render

such treatment inferior to available alternatives.  *See id.* § 23.46[2][e][ii].  As the authorities

recognize, the Rule 23(b)(3) class action contains some inherent drawbacks, especially when the

putative class is very large and geographically diverse, that do not exist in other cases, or even

other class actions, and these drawbacks must be evaluated in deciding whether class treatment

will be manageable.  *See id. (*citing *Gaffney v. United States*, 834 F. Supp. 1, 6 (D.D.C. 1993)

(class certification denied because notification and opt out procedures likely to be extremely

difficult to manage)).

Managing notice to the proposed class presents just one such practical difficulty in this

case.  A district court has no discretion to permit less than the "best notice that is practicable."

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173, 176 (1974) ("individual notice to identifiable

class members is not a discretionary consideration to be waived in a particular case. It is, rather,

an unambiguous requirement of Rule 23.").  The "best notice practicable" is almost always

mailed notice.  *Id.* at 175.  The right to individual notice and the opportunity to opt out are based

not only on the "unambiguous" language of Rule 23 itself, but have constitutional dimensions.

*See, e.g., Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 881 (7th Cir. 2000)(right to

personal notice and to opt out are based on Seventh Amendment and Due Process clause of Fifth

Amendment).

> **1.      Class treatment would present intractable management problems because plaintiffs rely on the "opt-out" provision to identify class members.**

As the Supreme Court makes clear, due process requires that absent class members

"receive notice plus an opportunity to be heard and participate in the litigation, whether in person

or through counsel." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).  In Rule

23(b)(3) class actions, in order to comport with due process, the notice must, "at a minimum"

provide an absent plaintiff "with an opportunity to remove himself from the class by executing

and returning an 'opt out' or 'request for exclusion' form to the court." *Id.* ("fully descriptive

notice . . . sent first-class mail to each class member, with an explanation of the right to 'opt out,'

satisfies due process.").

While problems with giving adequate notice may arise in any class action having a very

large number of potential class members, the importance of individual notice is greatly

heightened in this case because plaintiffs rely heavily on <u>non-members</u> of the class to "self-

identify" and "opt out" after receiving notice, if they are a) not consumers or b) have actual

damages.

This Court recognized the heightened importance of the opt-out process in its

memorandum order when it "assume[d] that the requested class would include only 'consumers'

who received violative receipts and would not have, or at least would agree not to claim, more

than $100 in actual damages." *Stillmock*, 2009 WL 595642 at *4.  Such an assumption is logical

if, as is implicit in the Court's memorandum order, <u>each</u> putative class member will receive

meaningful notice and, after reading it, be required to demonstrate that he or she is a "consumer"

and, further, signal that he or she "agrees" to waive actual damages.  The class may not include

business card users, so they must opt out, by definition.  Furthermore, unless each class member

agrees to waive actual damages, the class cannot include anyone who could claim them.  Persons

who are "consumers" and have actual damages—even it less than $100 dollars in actual

damages—cannot be presumed to be willing to include themselves in this class.  Even someone

with less than $100 in actual damages might very sensibly choose to proceed under a provision

allowing him or her to prevail on a showing of mere negligence (15 U.S.C. § 1681o(a)), rather

than agree to be part of a group that must show recklessness in order to prevail (15 U.S.C.

§ 1681n(a)).

That plaintiffs place this tremendous burden on the "opt-out" provision was clear at oral

argument on the original motion for class certification.  The Court pressed plaintiffs' counsel

concerning whether plaintiffs proposed "an affirmative election in, because you have to say I'm

not claiming damages."  Tr. at 62; lines 24-25.  Plaintiffs only response was:  "Well, by not

opting out. I mean, it's however you look at it, Your Honor. If you don't opt out, you're opting

into."  Tr. at 63; lines 1-3.  Plaintiffs' simplistic response did not answer the Court's question; it

merely swept it under the rug.  It is one thing to receive notice that you *are* a member of a class

and decide that you would rather not be a member.  That is what "opting out" is all about.  It is

quite another thing to give notice to millions of people who merely *may* be class members and

require them to opt out if, after having read the notice, they recognize that they are not members

of the class, as it is defined.  The latter is what plaintiffs appear to be proposing and it is not at all

clear that the "opt out" process that plaintiffs propose, in which class membership is determined

by the failure to "opt-out," is permissible under the Rule.

Even if it were, it would mean that the parties would need to craft, and the Court review

and approve, a notice that is complete in all respects and genuinely informs absent class

members (and non-class members) of their status and duties upon receipt.  To date, plaintiffs

have merely minimized the managerial problems that arise when the "opt-out" feature of Rule

23(b)(3) is being asked to do different work than it was designed to perform.

> **2.**    **Plaintiffs have failed to demonstrate that they can identify and locate member of the putative class.**

Representative plaintiffs must identify and locate class members.  *Oppenheimer Fund,*

*Inc. v. Sanders*, 437 U.S. 340 , 357 (1978).  As noted, the named plaintiffs, rather than using the

"opt-out" process to exclude those who, although class members, would rather not participate in the lawsuit, apparently depend on the "opt-out" feature of Rule 23(c)(2)(B) to *define* who is in the class and who is not.  Assuming, for the moment, that this is a permissible use of the "opt-out" feature in a Rule 23(b)(3) class action, it obviously increases the importance of finding a foolproof mechanism for finding those individuals who "might" be class members and providing meaningful individual notice to each one.  If, as the Fourth Circuit observed in a footnote (*Stillmock*, 2010 WL 2621041 at *7, n.7), there was little discussion of plaintiffs' ability to provide adequate notice in this Court's prior class certification ruling, it was undoubtedly because plaintiffs brought precious little grist to the mill.  In support of their original motion for class certification, plaintiffs simply asserted that they could send mailed notice to "approximately 90%" of the class by accessing Weis' "loyalty club" records.  Pl. Reply at 23.

The inflated 90% figure was a mere guess, based on a superficial treatment of industry data that was not even current at the time.  Pl. July 25, 2008 Mem. at 30 and Ex. 30 thereto.  The industry data themselves were without any testimonial support in the record.  Most notably, plaintiffs never obtained in discovery the "loyalty card" records that they argued contain the names and addresses of putative absent class members.  Named plaintiffs may not be excused from conducting this inquiry.  *See In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1103-04 (5th Cir. 1977) (representative plaintiffs required to conduct extensive search of 1.7 million computer cards to extract names and addresses of absent class members).  Here, that information is plainly relevant to whether the action is manageable as a class action and it is just as plain that plaintiffs failed to follow up when they had the opportunity to ask for it in discovery.  At deposition, Mr. William Mills, then CFO of Weis Markets, was asked whether he had "information regarding the number of transactions that take place at Weis Markets retail

locations that involve a club card?"  Mills Dep. Tr. at 55, lines 6-8 (attached as Ex. B).  He

affirmed that Weis Markets kept such records and identified the employee most knowledgeable

on the subject.  *Id.* at 56, lines 1-10.  Plaintiffs neither asked Mr. Mills to get additional

information nor sought to depose the employee he identified.

It seems probable that plaintiffs did not conduct this inquiry because they did not want to

know the answer.  In deposition, Weis Markets' store development and support specialist in

information technology, Frank Simpson, testified:   "When you apply for these [loyalty] cards

you really only have to put your name on it, no identifying information, no address.  You know,

if you just sign up and put John Smith on it, we'll actually give you the cards today to redeem."

Simpson Dep. Tr. at 24, lines 3-7 (attached as Ex. C).  Accordingly, even if mailed notice could

be sent to a large percentage of the "loyalty card" holders in the putative class, the record points

to a high likelihood that a great many notices would be returned as undeliverable.

Plaintiffs could not even settle on a probable number of members of the proposed class,

beyond asserting that it would meet the numerosity requirement of Rule 23(a).  Originally,

plaintiffs asserted that the class comprised "roughly 286,090 – 339,732 Class members with

transactions during the Class period."  Pl. July 25, 2008 Mem. at 19.  At oral argument before

this Court, plaintiffs again asserted "[w]e have we think about 300,000 people who fall into the

category of class members," while noting that defendant "thinks it's a million people."  Tr. at 84,

lines 6-8.  A disagreement of an order of magnitude as to the likely size of the class surely

indicates a problem with someone's calculations.

Perhaps sensing that they had failed to support their wild guesses, plaintiffs earlier

asserted that certification could precede a determination of "who is a member of a class."  Pl.

Reply at 21.  Relying on a case in which the defendant knew the Social Security numbers of the

entire proposed class, and hence exactly who and how many were in it, plaintiffs jumped to the

conclusion that, in this case, "the Court" could "use this or some other appropriate method to

identify the class . . . when the time arrives."  *Id.*  This is nonsense.  First, it is an obvious attempt

to shift the burden of identifying class members from the plaintiffs to the Court.  Second, no

single "appropriate method" to identify and reach the entire class has ever been proposed, which

greatly undermines plaintiffs' reliance on the appearance of some unnamed "other appropriate

method."

As noted, plaintiffs' only proposed "method" of identifying any members of the putative

class was their unsupported contention that "a very high percentage" could be identified by name

and address through Weis Markets' "loyalty card" data.  These data are, however, only as good

as the identifying information its "loyalty card" customers choose to divulge when asking for a

new or replacement "loyalty card."  Simpson Dep. Tr., *supra*, at 24.  Whether this method is

likely to reach a substantial number of the "loyalty card" participants, let alone a substantial

number of putative class members, depends on the nature and accuracy of the information those

customers gave in obtaining the card in the first place, a subject on which the record contains

only testimony that the addresses are not particularly reliable.

### 3. Plaintiffs' assertion that notice can be given to a substantial portion of the purported class is based only on speculation.

Plaintiffs' assertion that 90% of the putative class could be reached by mail addressed to

"loyalty card" customers alone is not only unsupported in the record, it is so improbable as to be

fairly termed impossible.  During the approximately six months between December 4, 2006 and

June 7, 2007, more than 13,040,768 receipts for credit/debit card transaction were printed at

Weis Markets stores.  Declaration of Thomas Mowery (hereinafter "Mowery Decl.") ¶ 2.  Of

these, 10,451,093 are attributable to 1,185,404  distinct "loyalty card" customers.  Mowery Decl.

¶ 6.  This works out to an average of just over 8.8 receipts per "loyalty card" customer.  It stands to reason that "loyalty card" customers are among the most frequent shoppers at any grocery store.  Even plaintiffs agree.  Pl. Reply at 23.  Indeed, some loyalty card customers shop at Weis Markets several times a week, judging by the quite high number of receipts attributable to many club card members.  Mowery Decl. ¶¶ 11-13.  In order for these 1,185,404 distinct Weis Markets "loyalty card" customers to constitute 90% of the total putative class, as plaintiffs posit, the remaining 2,589,675 receipts would have to belong to fewer than 131,717 customers, which works out to an average of approximately 20 receipts apiece, meaning that those without "loyalty cards" were, on average, over twice as loyal as those who had them.  It is inconceivable, therefore, that the "loyalty card" customers could possibly constitute 90% of putative class members.  Indeed, it is much more likely that the "non-loyalty card" segment is made up of customers who received many fewer receipts than did the "loyalty card" customers.  If we estimate that two receipts apiece is more reasonable than 20 for this group, the "non-loyalty card" population exceeds 1,294,837.[3]  Using that estimate, "loyalty card" customers account for fewer than half of the putative class members.

Thus, "the small percentage that [plaintiffs assert] cannot be identified" by the loyalty card records" (Pl. Reply at 23), turns out to be a much larger percentage than plaintiffs have surmised.  Indeed, it is almost certain to be the majority of the putative class.  Regardless whether a majority or only a very large minority, the question is not one that Weis Markets or this Court has the burden to answer.  Plaintiffs have the duty to gather information needed for the Court to draw a conclusion that a class can be identified and its individual members notified

---

[3]  Two receipts seems an eminently reasonable estimate for this group, given that, even among loyalty card customers, the largest segment made only two to five visits to Weis Markets during the relevant time period.  Mowery Decl. ¶ 8.

consistent with Rule 23 and due process.  This plaintiffs have failed even to attempt to do.  Even assuming, contrary to the record, that the "loyalty card" customer database contains accurate addresses for card holders, plaintiffs have not explained how they hope to "identify through reasonable effort" the names and last known addresses of other absentee class members and possible class members.  "Upon commencing a class action, the class representatives must be prepared to accept the concomitant responsibility of identifying absentee class members as well as paying the costs of their individual notice."  *In re Nissan*, 552 F.2d at 1102.  Where, as here, problems with providing notice are apparent and the plaintiffs have avoided, rather than confronted and solved, those problems, the Court "should not certify the class merely on the assurance of counsel that some solution will be found" in the future.  *See Windham*, 565 F.2d at 70 (citing *In Re Hotel Telephone Charges*, 500 F.2d 86, 90 (9th Cir. 1974)).

### C.      Superiority Is Lacking When Class Treatment Risks Highly Undesirable Results

Class certification is not warranted when it would invite a catastrophic statutory damages award far out of proportion to any possible harm—of which there has been none.  Judge Wilkinson's concurrence in this case states nothing but the obvious when he writes that the annihilation of Weis Markets and the loss of livelihood that would ensue could not possibly have been in the contemplation of Congress when it passed FACTA.  *Stillmock*, 2010 WL 2621041 at *8 (Wilkinson, J., concurring).

#### 1.      Consideration of the practical effects of a potential damages award in this case requires denial of class certification.

The United States Court of Appeals for the Fourth Circuit remanded this case with instructions to consider all the arguments that Weis Markets raises that did not form the basis for this Court's prior certification decision.  *Stillmock*, 2010 WL 2621041 at *7.  Prominent among these is the question of whether Rule 23(b)(3)'s superiority requirement could be met in

circumstances in which an award to the vast putative class would be ruinous to the defendant.  In its initial ruling on class certification, this Court expressly reserved decision on this question. *Stillmock*, 2009 WL 595642 at *6.

The enormity of the potential damages that concerned the court of appeals foretells a grim story if the proposed class were to be certified and prevail at trial.  Assuming that none of the 1,043,239 distinct "loyalty card" customers sees fit to opt out and further assuming that the remaining "non-loyalty card" segment of the putative class numbers no more than one million customers (which is likely a gross underestimate), an award of statutory damages would amount to no less than $204,323,900, and up to $2,043,239,000.  This is, as Judge Wilkinson's concurrence points out, "without even accounting for the possibility of punitive damages, attorney's fees, and costs."  *Stillmock*, 2010 WL 2621041 at *11 (citing 15 U.S.C. § 1681n(a)(2), (a)(3)).  Weis Markets' total shareholders' equity as of June 26, 2010, was $712,442,000, including goodwill.  Thus, the potential statutory damages in this case range from almost a third to nearly 300% of defendant's net worth.  Weis Markets could not survive such a blow and continue to serve the customers that depend on it for groceries and other staples. Declaration of Scott F. Frost (hereinafter "Frost Decl.") ¶¶ 8-9.

These mathematical projections have disturbing practical consequences beyond the effect on the company itself.  It is essential to descend from the theoretical plane and weigh the practical effects of class treatment—especially on the class itself—should the named plaintiffs prevail at trial on a class-wide basis.  *See Stillmock*, 2010 WL 2621041 at *11-*12.  A judgment in favor of a class the size of this one, amounting to hundreds of millions or billions of dollars before any punitive award, would mean that the class is almost certain never to recover the

remedy that a mathematical application of the statute would dictate.  What they would feel is the loss of local employment and the loss of a popular grocery chain.

Perhaps chief among these practical considerations is the fate of the thousands of employees of Weis Markets that had nothing whatsoever to do with the technological snafu that gave rise to this case.  *Id.* at *8 ("aggressive use of the class action device is a real jobs killer that Congress has not sanctioned.").  As of the close of its last fiscal year, Weis Markets employed "approximately 17,600 full-time and part-time associates."  Frost Decl., Exhibit B at 2.  Current economic conditions, especially in the largely extra-urban and rural areas served by Weis Markets, are not likely to absorb these unemployed, meaning the federal deficit will take the hit. *See* United States Department of Labor, *Unemployment Rates by County in Pennsylvania*, (Sept. 7, 2010), http://www.bls.gov/ro3/palaus.htm (reporting Pennsylvania unemployment rates in, for example, Lehigh County at 10.1%; Monroe County at 10.1%; Northumberland County at 9.9% and Luzerne County at 10.7%).

According to its most recent quarterly filing with the United States Securities and Exchange Commission, as of June 26, 2010, Weis Markets operated 164 retail food stores in Maryland, Pennsylvania, New Jersey, New York and West Virginia, and also operated 21 SuperPetz pet food stores as of the same date.  *See* Form 10-Q attached as Exhibit A to the Declaration of Scott F. Frost.  Bankrupting Weis Markets would mean not only unemployment for its employees, but the closing of any store that could not be swiftly sold.  The effect that store closures would have on local communities would be devastating.  The *Leysoto* court's observation about its facts, which concerned a quite small business, is equally applicable here: "It is difficult to ascertain the benefit to potential class members under the circumstances of this case."  *Leysoto v. Mama Mia I., Inc.*, 255 F.R.D. 693, 698 (S.D. Fla. 2009).  Threatening Weis

Markets with bankruptcy cannot be viewed as beneficial to a class of grocery shoppers who depend on Weis Markets, some of whom are also its employees.

Nor does ruining Weis Markets help investors in this public company.  At the end of 2009, there were approximately 8,454 shareholders of Weis Markets.  *See* Form 10-K attached as Exhibit B to the Frost Declaration at 6.  Weis Markets' 26,920,551 weighted-average common shares outstanding paid a dividend of $1.16 cents each in 2009 to these shareholders.  *Id.* at 7.  The effect on these shareholders of Weis Markets demise would be to strip them of their investment and the steady income it has generated over the years.

The horrific outcomes for Weis Markets, its customers, and its shareholders that are detailed in this section will not occur, of course, if a jury finds that Weis Markets did not act willfully.  Nevertheless, the mere possibility of these results and especially their effect on innocent employees and the public at large weighs heavily against class certification.  As Judge Wilkinson stressed, it cannot have been Congress's intent in passing FACTA to harm the very consumers that Congress must have believed it had set out to protect.  (*Stillmock*, 2010 WL 2621041 at *8.

> ### 2.  Rule 23(b)(3)'s superiority requirement is not satisfied where potential damages would annihilate Weis Markets and the harm to the putative class is non-existent.

The grim facts set forth above demonstrate that, as a practical matter, Weis Markets could not survive a judgment of statutory damages in favor of plaintiffs' proposed class of millions of consumers.  In such circumstances, plaintiffs fail to meet the "superiority" prong of Rule 23(b)(3).  Class certification that would put Weis Markets on the road to obliteration is indisputably an "undesirable result" of the sort that district courts must take into account in considering a motion for class certification.  As Judge Wilkinson correctly points out, nothing in the law "mandates class action treatment of FACTA claims or *precludes a district court from*

*considering the prospect of annihilative liability in the certification calculus.*" *Stillmock*, No. 09-1632, 2010 WL 2621041 at *8 (emphasis added).  Similarly, nothing in the Fourth Circuit's main opinion suggests that it is inappropriate to consider the enormity of a statutory damages award in the billions of dollars at the class certification stage of a case.  Despite what plaintiffs may argue, Judge Wilkinson is in the mainstream in stating that potentially crippling damages are an important factor in the "superiority" analysis under Rule 23(b)(3).[4]

Moreover, it is uncontested that Weis Markets corrected the faulty truncation of credit and debit card account numbers on electronic receipts at all of its stores on or before June 7, 2007, so there is no continuing violation to be corrected.  There has been no allegation of a single non-conforming receipt having appeared after the June 2007 date.  As this Court stated, Weis Markets ceased printing erroneous receipts "within 17 days" of the filing of the first of these suits and "[n]othing indicates that Weis has any intention or reason to again fail to comply with § 1681c(g)." *Stillmock*, 2009 WL 595642 at *3.  Because the purpose of FACTA was therefore served no later than June 7, 2007, and no actual harm to anyone has been alleged from the brief time period in which receipts were incorrectly printed, the potential for enormous class-wide statutory damages is wildly out of proportion to the injury, of which there has been none.

Not only is there no realistic possibility of a future violation by Weis Markets, the technical violation of FACTA at issue in this case was short-lived.  With respect to this point, the factual record needs some clarification.  In prior briefing, plaintiffs disingenuously stated that "Weis [Markets] failed to comply with FACTA for over three and a half years."  Plaintiffs'

---

[4]    Plaintiffs have relied upon *Murray v. GMAC Mortg. Corp.*, in which the Seventh Circuit ruled that concerns that an award may be excessive and disproportionate are best addressed after class certification.  434 F.3d 948, 954 (7th Cir. 2006).  To date, however, it is alone among the federal circuits in ruling out consideration of this factor in the superiority analysis.

Reply In Further Support of Motion for Certification of the Class [Docket #57] filed September 25, 2008 (hereinafter "Pl. Reply") at 6.  It cannot fairly be said that Weis Markets—or anyone—has failed to comply with a statute before the statute's effective date, but that is what plaintiffs assert.  The statute provides:

> This subsection shall become effective —
>
> (A) 3 years after December 4, 2003, with respect to any cash register or other machine or device that electronically prints receipts for credit card or debit card transactions that is in use before January 1, 2005; and
>
> (B) 1 year after December 4, 2003, with respect to any cash register or other machine or device that electronically prints receipts for credit card or debit card transactions that is first put into use on or after January 1, 2005.

15 U.S.C. §1681c(g)(3).

Although inelegantly worded, perhaps, because it purports to make the statute effective as to certain machines almost one month before those machines were placed in use, FACTA's truncation requirement, as a practical matter, went into effect for newly installed point-of-sale equipment on January 1, 2005.  It went into effect for equipment already in use before January 1, 2005, only on December 4, 2006.  It went into effect as to nothing and no one three and one half years before June 7, 2007.[5]

_____

[5]   Weis Markets' responses to discovery show only four machines in a single store to which subsection (B) could have applied, which went into service on September 1, 2006. Mowery Decl. ¶ 4.  No other machines were newly put in service by Weis Markets between January 1, 2005 and December 4, 2006, so that the effective date of FACTA with respect to virtually all the machines at issue in this action is December 4, 2006. Therefore the period in question is a little more than six months for every Weis Markets store (save one) and, as to only four machines in that one store, a little more than nine months.  It is not the two and one-half year period "starting no later than January 1, 2005, and continuing until about June 2007," that is discussed in the court of appeals' opinion, _Stillmock_, 2010 WL 2621041 at *2, and certainly not the "three and a half years" previously asserted by plaintiffs.

3.      **It is entirely appropriate, indeed essential, to consider potential damages at the class certification stage.**

The 1972 decision, *Ratner v. Chemical Bank New York Trust Company*, gave birth to the idea that annihilating statutory damages that are highly disproportionate to any harm render a class action not superior under Rule 23(b)(3). 54 F.R.D. 412 (S.D.N.Y. 1972). In *Ratner*, Judge Marvin Frankel declined to certify a damages class under the Truth in Lending Act ("TILA") where "[t]he proposed recovery of $100 each for some 130,000 class members would be a horrendous, possibly annihilating punishment, unrelated to any damages to the purported class or to any benefit to defendant, for what is at most a technical and debatable violation of the Truth in Lending Act." *Id.* at 416. Under applicable law at the time, TILA plaintiffs could request "minimum damages of $100, plus costs and a reasonable attorney's fee, without proof of any actual damages whatever." *Ratner*, 54 F.R.D. at 413. A later amendment to TILA capped statutory damages available in a class action. *See* 15 U.S.C. § 1640(a)(2)(B).[6] Although plaintiffs will contend that any consideration of massively disproportionate damages must await the actual award of such damages and may not figure into the "superiority" analysis, the Fourth Circuit Court of Appeals correctly observed that "Judge Frankel expressed what was to become the prevailing view" on this subject. *Barber v. Kimbrell's*, 577 F.2d 216, 223 n.18 (4th Cir.

---

[6]      15 U.S.C. § 1640(a)(2)(B) limits class action recoveries to "not . . . more than the lesser of $ 500,000 or 1 per centum of the net worth of the creditor" for both TILA and the Consumer Leasing Act, 15 U.S.C. §§ 1667-1667f). Three of the five other subchapters of the Consumer Credit Protection Act, 15 U.S.C. §§ 1601-1693r, similarly cap class action damages. *See* 15 U.S.C. § 1691e(b) (Equal Credit Opportunity Act); 15 U.S.C. § 1692k(a)(2)(B) (Fair Debt Collection Practice Act); 15 U.S.C. § 1693m(a)(2)(B)(ii) (Electronic Funds Transfer Act). Another subchapter, the Credit Repair Organizations Act, does not allow statutory damages. 15 U.S.C. § 1679g(a)(1). The FCRA is the only one of the seven subchapters of the Consumer Credit Protection Act that does not limit the amount of statutory damages available in a class action.

1978).[7]  It seems more than likely that Judge Frankel, and other courts who followed him, were instrumental in bringing about the sensible 1974 amendment to TILA capping class action damages.[8]  So much for plaintiffs' assertion that district courts must slavishly multiply statutory damages, even in circumstances in which the result "would carry to an absurd and stultifying extreme . . . [the] remedy Congress prescribed as the means of private enforcement." *Ratner,* 54 F.R.D. at 414.

And, in fact, district courts have not routinely certified FACTA class actions.  In briefing plaintiffs' original motion for class certification, plaintiffs cited numerous cases in which classes had been certified under FACTA.  *See* Pl. Reply at 5, n.5.  Most of these cases came from a single district, the Northern District of Illinois.  *Id.*  Weis Markets, in turn, cited numerous cases in which district courts refused to certify such classes.  Def. Opposition at 10, n.3.  It is hardly surprising that a large number of FACTA cases emerged in cities like Chicago and Los Angeles. It is also unsurprising that courts in the Seventh Circuit routinely certify, in light of precedent, *see Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006), and that courts in Ninth Circuit do not.

---

[7]     *See London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 n.5 (11th Cir. 2003) (expressing doubt that superiority requirement is met when class suffers no economic harm and "the defendants' potential liability would be enormous and completely out of proportion to any harm suffered"); *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1378 (11th Cir. 1984) (affirming denial of class certification); *Watkins v. Simmons & Clark, Inc.*, 618 F.2d 398, 403-04 (6th Cir. 1980) (same); *Wilcox v. Commerce Bank*, 474 F.2d 336, 345, 347 (10th Cir. 1973) (affirming denial of certification where class treatment appeared "procedurally unnecessary and overwhelming" (citing *Ratner* with approval)); *see also Alsup v. Montgomery Ward & Co.*, 57 F.R.D. 89, 93 (N.D. Cal. 1972)( "[T]he great majority of the courts to consider the issue of class actions under the Truth in Lending Act to date have followed Judge Frankel in finding the class action is not superior to the remedies provided for in the Act itself.").

[8]     Plaintiff's assertion that "Congress implicitly overturned *Ratner* by amending TILA and capping statutory damages in class actions" is risible.  *See* Pl. Reply at 10.  Without *Ratner*, and the decisions that followed it, Congress might never have acted.

As one district court unconnected to either circuit summarized:

[D]istrict courts in the Ninth Circuit, which typically deny class certification, generally hold potential FACTA class damages to be a highly probative consideration under Rule 23, and further still, that such potential class damages preclude certification under the superiority requirement of Rule 23(b)(3).   In contrast, district courts in the Seventh Circuit, which  consistently grant FACTA certification, prohibit consideration of potential class damages in undertaking Rule 23 analysis.

*Leysoto v. Mama Mia I., Inc.*, 255 F.R.D. 693, 697 (S.D.Fla. 2009) (internal citations omitted).

The *Leysoto* court held that superiority was not satisfied, because "the threat of annihilation associated with certification does not serve the purpose of the legislation, and moreover, is simply unnecessary to effectively enforce the Act and compensate victims of identity theft." *Id.* at 699.  The only expression of any kind from the Fourth Circuit Court of Appeals on whether the threat of annihilation may be considered at the class certification stage in a FACTA case are the opinions in this case, which strongly side with those courts that have found the potential for excessive damages a relevant factor in certifying a class.  As noted, moreover, the Fourth Circuit had implicitly approved *Ratner*'s main holding years before. *Barber*, 577 F.2d 216 at n.18.

In light of the guidance that Judge Wilkinson's concurrence affords, it is unnecessary, maybe even superfluous, to recite once again the numerous cases in which class certification was denied.  It would be more superfluous still to list all of the California cases denying class certification when an excellent and exhaustive summary has so recently been provided by a court in that district.  *See In re: Toys "R" Us – Del., Inc. – FACTA Litig.*, MDL 08-01980 MMM, slip op. at 15-28 (C.D. Cal. August 17, 2010) (attached as Exhibit D).  In *In re Toys "R" Us*, Judge

Morrow traces the broad acceptance that Judge Frankel's decision in *Ratner* has received in the district courts and the courts of appeals across the nation. *Id.* at 10-12.[9]

### 4. Class Treatment Is Not Superior to alternative methods of resolving the issues raised by plaintiffs.

Plaintiffs allege that Weis Markets willfully violated FACTA. Class action litigation is only one way, and certainly not the superior way under these circumstances, to determine whether such a violation occurred and whether and how a defendant should be penalized if a willful infraction is proven. The superiority prong of Rule 23(b)(3) requires a district court to "'compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy.'" *Stillmock*, 2010 WL 2621041 at *6 (quoting 7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1779 (3d ed. 2005)).

The Fourth Circuit opined that the range of statutory damages, combined with the low probability of large punitive damages, would make an "individual action unattractive from a plaintiff's perspective." *Stillmock,* 2010 WL 2621041 at *7. Judge Wilkinson concurred, but concluded that "[t]here is no shortage of incentives for consumers to bring individual suits under FACTA," and did not read "the court's judgment to preclude the exercise of discretion" to find individual actions preferable on remand. *Id.* at *14. If there is any tension between the Fourth

---

[9]     As Judge Morrow points out, Judge Frankel was not a mere casual observer but was recognized as an authority on Rule 23. *Id.*, slip op. at 10-11, n.14 (citing, *inter alia*, *Legge v. Nextel Communications, Inc.*, No. CV 02-8676 DSF (VNKx), 2004 WL 5235587, *16 (C.D. Cal. June 25, 2004)(describing Judge Frankel as "one of the architects of Rule 23") and Marvin E. Frankel, *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39 (1967)). *See also* Marvin E. Frankel, *Amended Rule 23 from a Judge's Point of View*, 32 Antitrust L.J. 395 (1966). Judge Frankel was quoted by the Fourth Circuit in *Windham* for the proposition that Rule 23 "is neither a set of prescriptions nor a blue print . . . [but] rather, a broad outline of general policies and discretions. . . . [which] confides to the district judges a broad range of discretion." 565 F.2d at 65, n.8 (citing Frankel, *Some Preliminary Observations*).

Circuit's judgment and Judge Wilkinson's concurring opinion in this regard, it reflects a lack of consensus in the federal courts as to whether individual actions would be effective at enforcement. *Compare Chakejian v. Equifax Information Services, LLC*, 256 F.R.D. 492, 501-02 (E.D.Pa. 2009) (Rule 23(b)(3) class approved where there are a large number of potential plaintiffs pursuing statutory claims with a relatively small amount of potential recovery), *with Price v. Lucky Strike Entertainment, Inc.,* No. CV 07-0960 ODW(MANX), 2007 WL 4812281, at *2 (C.D. Cal. Aug. 31, 2007)(denying class certification because plaintiffs will be able to bring individual actions "with little or no economic hindrance"); *Najarian v. Avis Rent a Car Sys.*, No. CV 07-588-RGK (Ex), 2007 U.S. Dist. LEXIS 59932, at *17 (C.D. Cal. June 13, 2007)(Same); *Campos v. Choicepoint, Inc.*, 237 F.R.D. 478, 490 (N.D. Ga. 2005) (noting that the "FCRA provides sufficient motivation for adversely affected individuals to bring suit and for attorneys to represent them"); *Maguire v. Sandy Mac, Inc.*, 145 F.R.D. 50, 53 (D.N.J. 1992) (where statute provides attorney fees to a prevailing plaintiff, "there is less incentive to protect by class certification individuals with small claims"); *Mathews v. Book-of-the-Month-Club, Inc.*, 62 F.R.D. 479 (N.D. Cal. 1974) ("[s]tatutory penalties, including attorneys' fees, are a substitute, in vindicating the rights of the small litigant for the class action device"); *Anderson v. Capital One Bank*, 224 F.R.D. 444, 453-54 (W.D. Wis. 2004) (explaining that individual FCRA suits "are essentially costless because [plaintiffs] are entitled to an award of attorney fees and costs they incur in bringing suit").

This lack of consensus exemplifies serious doubt as to whether the purposes behind aggregating small claims are well-served in these circumstances. It is clear that the class action mechanism is intended, at least in part, "'to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action . . . by aggregating the relatively

24

paltry potential recoveries into something worth someone's (usually an attorney's) labor.'"

*Amchem*, 521 U.S. 591, 617 (1997) (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344

(7th Cir. 1997). Thus, the logic goes, class actions make small claims "marketable," so that they

may serve as a deterrent through uncovering harm and making wrongdoers disgorge their ill-

gotten gains. Here, however, there have been no injuries, even small ones, incurred by anyone

and there were no "ill-gotten gains" accruing to Weis Markets, nor have the plaintiffs seriously

pretended that there could have been. In failing to truncate customer account numbers properly

for the brief period in question, Weis Markets "sought no pecuniary gain for itself." *See Serna v.

Big A Drug Stores, Inc.*, No. SACV 07-0276 CJC(MLGX), 2007 U.S. Dist. LEXIS 82023 at

*16-*17 (C.D. Cal. Oct. 9, 2007) (denying certification where defendant who had not

"affirmatively" set out to violate the law "would face class litigation with 'bet the company' type

stakes for a technical violation of a statute which caused no injury"). Indeed, far from there

being "ill-gotten gains," deterrence is served, as Judge Wilkinson points out, even by individual

private actions, simply because "the costs of compliance with the [FACTA] statute remain minor

in comparison to the costs of dealing with litigation, in whatever form it may assume."

*Stillmock,* 2010 WL 2621041 at *14. Accordingly, the traditional rationale for aggregating

small claims does not exist and the only function that this case would serve, if certified as a class

action, would be punishment.

Even if punishment were deemed a necessary deterrent, however, there are effective

enforcement provisions available that do not entail a class action capable of destroying an

established business and putting all of its employees out of work. The Federal Trade

Commission is delegated the power to seek appropriate injunctive relief, 15 U.S.C. § 1681s(a),

and to extract civil penalties, 15 U.S.C. § 1681s(b), for FACTA violations. "In the event of a

knowing violation, which constitutes a pattern or practice of violations of this subchapter, the Commission may commence a civil action to recover a civil penalty . . . of not more than $2,500 per violation." 15 U.S.C. § 1681s(a)(2)(A).  Thus, the FTC may act against "willful" violations of FACTA, regardless whether individual civil actions or putative class actions have already been commenced.

In clear contrast to the Draconian effect that statutory damages under section 1681n(a)(1)(A) might have in a class action context, however, when a civil penalty is sought by the FTC, the law expressly provides that, in setting such a penalty, "the court *shall* take into account the degree of culpability, any history of prior such conduct, ability to pay, *effect on ability to continue to do business*, and such other matters as justice may require."  15 U.S.C. § 1681s(a)(2)(B)(emphasis added).  It would be absurd to conclude that Congress, having explicitly reigned in civil penalties in actions brought by the federal government in order to prevent adverse effects on a defendant's "ability to continue to do business," intended district courts to ignore that factor when plaintiffs seek to certify a class of millions of unharmed individuals.  Yet even if one draws that shaky conclusion, it is apparent that an action by the FTC for a civil penalty is "superior" to a class action, because it expressly protects against the annihilation a defendant faces in a Rule 23(b)(3) class action such as is sought here.

### D.    The possibility of attorney abuse of the system strongly militates against class certification.

In support of their original motion for class certification, plaintiffs asserted that their counsel had not abused the legal system.  Pl. Reply at 8.  This argument completely misses the point.  It is not necessary to find that counsel's conduct in an individual case merits sanctions under Rule 11 in order to weigh the serious potential for attorney abuse in the class certification calculus.  The concern that Rule 23(b)(3) can be used to solicit litigation that ultimately benefits

attorneys more than the plaintiff class is legitimate, regardless whether counsel crosses the line to improper behavior.  Indeed, courts have struggled with the problem for years without invoking Rule 11.  *See, e.g., Buford v. Am. Fin. Co.*, 333 F. Supp. 1243, 1251 (N.D. Ga. 1971)(Solicitation of litigation is an "'undesirable result' which cannot be tolerated.").  The threat of abuse of the class action device has been frequently recognized as a basis for denying class certification in FACTA cases.  *See, e.g., Price*, 2007 WL 4812281 at *5 (noting class counsel was involved "in no fewer than twenty FACTA cases" in the Central District of California alone (emphasis omitted)).

Moreover, this case is not free from the taint of solicitation.  Plaintiff Patrick Stillmock testified in this case that he responded to a solicitation to become a putative class representative.  P. Stillmock Dep. at 21:11 to 29:13 (attached as Exhibit E).  Mr. Stillmock is (or was) a named plaintiff in this and three other FACTA cases.  *Id.*  At deposition, Mr. Stillmock could not, regrettably, remember whether the solicitation he received respecting Weis Markets came from his counsel in this matter.  *Id.* at 46-47, 59, 63.  Tellingly, plaintiffs have never produced the written solicitation in discovery, even though Mr. Stillmock was obliged to preserve it by the rules governing discovery.

Other courts have noted the annoying multiplicity of suits alleging FACTA violations, all brought by the same lawyers.  *See Lopez v. KB Toys Retail, Inc.*, No. CV 07-144-JFW (CWx), 2007 U.S. Dist. LEXIS 82025, at *18 (C.D. Cal. July 17, 2007) (noting plaintiffs' counsel was counsel "in at least 42 other similar actions in this District alleging violations of FACTA"); *see also Simon v. Ashworth, Inc.*, No. CV071324GHKAJWX, 2007 WL 4811932, at *4 (C.D. Cal. Sept. 28, 2007).  It is not an argument for class certification that plaintiff's counsel will prosper as a result.

Class certification is also inappropriate if it would simply hand the plaintiff a cudgel with which to intimidate a defendant into "blackmail settlement," which is defined as "settlements induced by a small probability of an immense judgment in a class action." *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1298 (7th Cir. 1995). Indeed, the United States Supreme Court has recognized that "[e]ven weak cases . . . may have substantial settlement value . . . because [t]he very pendency of the lawsuit may frustrate or delay normal business activity." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 US 71, 80 (2006)(internal quotation marks omitted). This is one reason that a class certification decision is of such critical importance. It is undeniable that class certification puts immense pressure on defendants to settle claims, even claims they may reasonably consider worthless. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008)("class certification may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability")(internal quotation marks omitted); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 162 (3d Cir. 2001) (recognizing "that denying or granting class certification is often the defining moment in class actions . . . [because] it may . . . create unwarranted pressure to settle nonmeritorious claims on the part of defendants"); *Philip Morris, Inc. v. Angeletti*, 358 Md. 689, 721 (2000) (recognizing "concern that granting class certification significantly increases the pressure on a risk-adverse defendant to settle pending class claims rather than face the threat of an exceptional award of damages.") (Maryland law).

In the securities area, after watching a rising tide of class actions of questionable merit, Congress revealed its outright hostility toward such litigation in enacting the Private Securities Litigation Reform Act. *See* 15 U.S.C. § 78u-4(b)(2) (requiring particularity in securities fraud complaint where "plaintiff may recover money damages only on proof that the defendant acted

with a particular state of mind"); *id.* § 78u-4(c) (providing sanctions for abusive litigation).  Like

the securities fraud laws, the FCRA damages scheme permits plaintiffs to recover only upon

proof that the defendant acted with a "particular state of mind," *i.e.*, willfulness.  Similarly,

Congress provided direct sanctions for abusive litigation.  *See* 15 U.S.C. § 1681n(c).  Controlling

runaway litigation, therefore, and lessening the time and effort that courts and litigants inevitably

expend on meritless claims are legitimate public concerns not lost on Congress.  Having sought

to control such litigation in clear language, Congress cannot be thought to have forbidden district

courts from weighing the potential for abusive litigation when deciding whether to grant or deny

class certification.  Given the high potential for abuse compared with the complete absence of

any actual damages or need to correct any ongoing wrong, class certification should be denied in

this instance.

Finally, part and parcel of plaintiffs' argument that class certification is appropriate

notwithstanding the potential for devastating damages is the implicit assumption that outsized

damages can be reduced after a verdict is rendered.  The argument is revealing.  In this case,

assuming a mere 2 million class members, the minimum award of statutory damages would be

$200 million dollars.  In order not to capsize the ship that holds the means to pay damages, the

award would necessarily need to be remitted to a number far below the statutory minimum award

per class member.  Following plaintiffs' logic, it is acceptable to certify a class even though the

absent class members may not receive even the minimum statutory award because the defendant

would be unable to pay, but is supposedly unacceptable to consider ability to pay and the

practical effect of a disabling statutory damages award the public at large to deny class

certification.  This is a logic that serves only plaintiffs' counsel.

If the named plaintiffs prevail in this action, Weis Markets will be financially crushed, its employees and stockholders ruined, many of the general public deprived of their grocer, and there will be no way to fund a multi-million or multi-billion dollar award, so the absent class members will go without the recompense that Congress is said to have wanted them to have. Given these facts, a costly and time-consuming class action is "hardly the superior method for resolving the dispute." *Sanchez v. Wal Mart Stores, Inc.*, No. Civ. 2:06-CV-02573-JAM-KAM, 2009 U.S. Dist. LEXIS 48428 at *11 (E.D. Cal. May 28, 2009) (internal quotations omitted) (citing *In Re Hotel Telephone Charges*, 500 F.2d at 91 (citing *Free World Foreign Cars, Inc. v. Alfa Romeo*, 55 F.R.D. 26 (S.D.N.Y.1972); *Cotchett v. Avis Rent-A-Car System, Inc.*, 56 F.R.D. 549 (S.D.N.Y.1972))).

### E.   The named plaintiffs cannot represent the multiple sub-classes that the Fourth Circuit found necessary to resolve the issue of disparate damages.

Even if plaintiffs could somehow vault the hurdles that the "superiority" prong of Rule 23(b)(3) raises, they cannot meet the Rule's requirements with respect to the entire proposed class.  While the Fourth Circuit held that "predominance" under Rule 23(b)(3) is "qualitative rather than quantitative," the court of appeals clearly recognized that the difference in the number of non-conforming receipts that each individual consumer received is relevant to the amount of statutory damages that may be awarded.  *Stillmock*, 2010 WL 2621041 at *5.  That recognition follows directly from its holding that statutory damages under § 1681n(a)(1)(A) apply on a "per consumer" basis, not a "per violation" basis.  *Id.*  According to the Fourth Circuit, the disparate effect from vastly different numbers of receipts need not be an impediment to class certification, because the "class can be broken down into subcategories based upon the number of violating receipts received per putative class member."  *Id.*  Thus, the Fourth Circuit concludes that, if a class of consumers is to be certified, it must be effectively sub-classed into

different strata based upon the number of non-compliant receipts received by the consumer. Plaintiffs have proposed no such sub-classing to date.

It doesn't appear that the plaintiffs could adequately sub-class this vast putative class in such a manner as to permit these named plaintiffs to represent all the members of the putative class. The Stillmocks have placed into the record a total of nine receipts, two of which are dated on or after the date their counsel signed the complaint. *See* Exhibit 2 to Motion For Certification of the Class, Document 48-2, filed 07/25/2008. Ms. Barnstein produced five receipts during the relevant time period. *See* Exhibit 4 to Motion For Certification of the Class, Document 48-4, filed 07/25/2008. Mr. Opacic produced only one receipt. *See* Exhibit 3 to Motion For Certification of the Class, Document 48-3 Filed 07/25/2008.

According to the records of Weis Markets, however, the Stillmocks' Weis Markets club card was used 29 times in the time period December 4, 2006 to June 7, 2007. Mowery Decl. ¶ 14. Ms. Barnstein's club card was used a total of 32 times in the same period of time. *Id.* ¶ 15. Leonard Opacic's club card was used only once. *Id.* ¶ 16.

The record clearly demonstrates the lack of a suitable class representative for each necessary sub-class. *See* Rule 23(c)(5) ("Subclasses . . . are each treated as a class under this rule."). Because each sub-class requires a representative whose claims are typical of the claims of all members of that sub-class, each sub-class needs a representative who claims to have received approximately the same number of receipts. Mr. Opacic might therefore serve to represent the 317,541 club card customers who received a single receipt during the relevant time period, assuming they are all consumers and an unknown number of non club card customers. Mowery Decl. ¶¶ 7, 16. Ms. Barnstein and the Stillmocks both fall into the group of customers that received 26 to 50 receipts in the same time period, which includes 86,089 club card

customers and very probably few, if any, non club card customers.  Mowery Decl. ¶¶ 11, 14-15.

There is no named plaintiff who can serve as representative of largest segment of the loyalty card

holders, *i.e.*, the 380,580 club card customers who received two to five receipts.  Mowery Decl.

¶ 8.  Similarly, there is none to represent the customers who received six to ten receipts, 11 to 25

receipts, 51 to 100 receipts, or more than 100 receipts.  *See* Mowery Decl. ¶¶ 9-10, 12-13.  Of

course, the Court might decide that an even finer division of the whole class would be necessary,

in which case the number of unrepresented members would increase.

      Conceding that the Fourth Circuit has concluded that individualized damages issues do

not "predominate" in this case, the need to address and resolve individual issues affecting

damages—whether through sub-classing as the court of appeals suggests or otherwise—is

nevertheless a further consideration in deciding whether a class action will be manageable.  *See*

*Windham*, 565 F.2d at 68-69.  In this case, leaving aside other manageability problems discussed

above, a class action employing sub-classes would be manageable, at best, only for two

relatively small sub-classes, leaving a large section of the entire putative class unrepresented.

IV.    **CONCLUSION**

For all the foregoing reasons, Weis Markets respectfully requests that the Court deny

plaintiffs' renewed motion for class certification.

Respectfully submitted,

_____/s/_____

Gerard J. Gaeng (Bar No. 04970)
Rosenberg | Martin | Greenberg, LLP
25 S. Charles St., Suite 2115
Baltimore, MD 21201
Phone: (410) 727-6600
Fax: (410) 727-1115

and

OF COUNSEL
Dana B. Klinges
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103-4196
Phone: (215) 979-1143
Fax: (215) 405-2632

and

Charles M. Hart
DUANE MORRIS LLP
1940 Route 70 East, Suite 200
Cherry Hill, NJ  08003
Telephone: 856.874.4200
Fax: 215-405-2548

Attorneys for Weis Markets, Inc.

Dated:  September 24, 2010